**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOCIAL LIFE MAGAZINE, INC., <br><br> Plaintiff, <br><br> —*against*— <br><br> SENTINEL INSURANCE <br> COMPANY LIMITED, <br><br> Defendant. | 20 Civ. 3311 (VEC) |

**SENTINEL INSURANCE COMPANY LTD.'S**
**OPPOSITION TO SOCIAL LIFE MAGAZINE, INC.'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

May 12, 2020

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND FACTS .......................................................................................................... 3

      Social Life ....................................................................................................................... 3

      Social Life's Insurance Coverage .................................................................................. 3

      Sentinel Denies Coverage .............................................................................................. 4

      Procedural History ......................................................................................................... 5

STANDARD FOR A PRELIMINARY INJUNCTION .......................................................... 6

DISCUSSION ............................................................................................................................ 7

    I.      SOCIAL LIFE HAS NOT SHOWN IRREPARABLE HARM............................................... 7

    II.     SOCIAL LIFE HAS NOT SHOWN A CLEAR OR
          SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ...................................... 11

         A.      Social Life Has Not Shown Coverage Under the
                Clause for "Direct Physical Loss" or "Physical Damage"....................... 12

             1.      Social Life's Closure Was Caused by the Pandemic,
                   Not By Property Damage At Its Premises ................................... 12

             2.      Social Life Has Not Shown That There Was Any
                   "Physical" Loss or Damage to Its Premises................................ 15

             3.      The Absence of a Virus Exclusion Does
                   Not Mean Virus Related Losses Are Covered............................. 18

             4.      Social Life Relies on Easily Distinguishable Cases
                   That Are Primarily From Outside New York .............................. 19

             5.      The Two New York Cases Social Life Cites
                   Support Sentinel's Position......................................................... 20

         B.      Social Life Has Not Shown Coverage
                 Under the "Civil Authority" Clause......................................................... 21

    III.    SOCIAL LIFE HAS NOT SHOWN THAT THE BALANCE OF HARMS
          OR PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION .................................. 23

    IV.    THE COURT SHOULD CONDITION ANY INJUNCTION
          ON SOCIAL LIFE POSTING ADEQUATE SECURITY .................................................. 25

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Auto Sunroof of Larchmont, Inc. v. American Sunroof Corp.*,
    639 F. Supp. 1492 (S.D.N.Y. 1986)................................................................ 8

*Dae Associates, LLC v. AXA Art Insurance Corp.*,
    158 A.D.3d 493 (1st Dep't 2018) ................................................................ 12

*Datatab, Inc. v. St. Paul Fire & Marine Insurance Co.*,
    347 F. Supp. 36 (S.D.N.Y. 1972) ............................................................. 20, 21

*Diggs v. City of New York*,
    11 Civ. 1127, 2019 WL 4361023 (S.D.N.Y. Sept. 12, 2019)......................... 21

*Doctor's Associates, Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996)......................................................................... 25

*Dorfmann v. Boozer*,
    414 F.2d 1168 (D.C. Cir. 1969) ................................................................. 24

*Downtown Restaurant v. Fireman's Insurance*,
    No. 0602848/2003, 2007 WL 2175637 (N.Y. Sup. Ct. May 17, 2007).......... 20

*Gregory Packaging, Inc. v. Travelers Property Casualty Co.*,
    No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014) .................... 19

*Iannucci v. Allstate Insurance Co.*,
    354 F. Supp. 3d 125 (N.D.N.Y. 2018) ....................................................... 16

*Interboro Institute, Inc. v. Maurer*,
    956 F. Supp. 188 (N.D.N.Y. 1997).............................................................. 10

*Interphoto Corp. v. Minolta Corp.*,
    417 F.2d 621 (2d Cir. 1969)......................................................................... 9

*Jacobson & Co., Inc. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977)......................................................................... 9

*Jane Street Holding, LLC v. Aspen American Insurance Co.*,
    13 Civ. 2291, 2014 WL 28600 (S.D.N.Y. Jan. 2, 2014).................................. 11

*Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ........................................................... 9

*Keyspan Gas East Corp. v Munich Reinsurance America, Inc.*,
    96 N.E.3d 209 (N.Y. 2019) ...................................................................... 12

*Knapp v. Walden*,
    367 F. Supp. 385 (S.D.N.Y. 1973) ............................................................. 24

*Mama Jo's, Inc. v. Sparta Insurance Co.*,
    No. 17-cv-23362, 2018 WL 3412974 (S.D. Fla. June 11, 2018) ..................... 16

*Mastellone v. Lightning Rod Mutual Insurance Co.*,
    884 N.E.2d 1130 (Ohio App. 2008) ........................................................... 16

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................ 6

*Morgan Stanley Group Inc. v. New England Insurance Co.*,
    225 F.3d 270 (2d Cir. 2000) ............................................................... 11, 18

*Motorists Mutual Insurance Co. v. Hardinger*,
    131 F. App'x. 823 (3d Cir. 2005) .............................................................. 19

*Newman Myers Kreines Gross Harris, P.C. v. Great Northern Insurance Co.*,
    17 F. Supp. 3d 323 (S.D.N.Y. 2014) ............................................. 13, 14, 17, 19

*North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ...................................................................... 11

*Pahuta v. Massey-Ferguson, Inc.*,
    170 F.3d 125 (2d Cir. 1999) ..................................................................... 13

*Paradies Shops, Inc. v. Hartford Fire Insurance Co.*,
    No. 1:03-cv-3154-JEC, 2004 WL 5704715 (N.D. Ga. Dec. 15, 2004) ............ 23

*Paramount Brands, Inc. v. Peerless Importers, Inc.*,
    No. CV-92-5190, 1992 WL 355601 (E.D.N.Y. Nov. 19, 1992) ....................... 9

*Philadelphia Parking Authority v. Federal Insurance Co.*,
    385 F.Supp.2d 280 (S.D.N.Y. 2005) .......................................................... 16

*Phillip v. Fairfield University*,
    118 F.3d 131 (2d Cir. 1997) ..................................................................... 11

*Port Authority of New York & New Jersey v. Affiliated FM Insurance Co.*,
    311 F.3d 226 (3d Cir. 2002) ..................................................................... 16

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)..................................................................................... 7

*Reuters Ltd. v. United Press International, Inc.*,
    903 F.2d 904 (2d Cir. 1990).................................................................................... 10

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)..................................................................................... 7

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*,
    749 F.2d 124 (2d Cir. 1984)..................................................................................... 9

*Roundabout Theatre Co. v Continental Casualty Co.*,
    302 A.D.2d 1 (1st Dep't 2002) ........................................................................... 12, 13

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir. 1970).................................................................................... 9

*Shepard Industries, Inc. v. 135 East 57th Street, LLC*,
    97 Civ. 8447, 1999 WL 728641 (S.D.N.Y. Sept. 17, 1999)...................................... 9

*South Texas Medical Clinics, P.A. v. CNA Financial Corp.*,
    No. H-06-4041, 2008 WL 450012 (S.D. Tex. Feb. 15, 2008)................................... 23

*Southern Hospitality, Inc. v. Zurich American Insurance Co.*,
    393 F.3d 1137 (10th Cir. 2004) .............................................................................. 22

*St. Paul Mercury Insurance Co. v. Magnolia Lady, Inc.*,
    No. 2:97-cv-153 BB, 1999 WL 33537191 (N.D. Miss. Nov. 4, 1999) ..................... 22

*Syufy Enterprises v. Home Insurance Co. of Indiana*,
    No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995) ............................ 22

*Ticor Title Insurance Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)....................................................................................... 9

*TRAVCO Insurance Co. v. Ward*,
    715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013)............. 19

*United Air Lines, Inc. v. Insurance Co. of State of Pennsylvania*,
    439 F.3d 128 (2d Cir. 2006)............................................................................... 22, 23

*Universal Image Productions, Inc. v. Federal Insurance Co.*,
    475 F. App'x 569 (6th Cir. 2012) ........................................................................... 16

*Village of Sylvan Beach v. Travelers Indem. Co.*,
    55 F.3d 114 (2d Cir. 1995)..................................................................................... 11

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................ 6

## STATUTES

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136 (2020)........................... 8

## RULES

Fed. R. Civ. P. 65...................................................................................................... 25

## TREATISES

10A Steven Plitt, et al. Couch on Insurance § 148:46 (3d ed. 1995)............................................ 16

11A Charles Alan Wright, et al., Federal Practice & Procedure § 2948.4 (3d ed. 2013)............. 25

## OTHER AUTHORITIES

Dr. Neeltje van Doremalen, et al., Aerosol and Surface Stability of SARS-CoV-2 as
    Compared with SARS-CoV-1, *New England Journal of Medicine* (Apr. 16, 2020)........ 17

## INTRODUCTION

Social Life Magazine, Inc. ("Social Life"), the publisher of a magazine distributed in the Hamptons and focused on luxury products, has asked this Court for a preliminary injunction requiring Sentinel Insurance Company Ltd. ("Sentinel") to pay immediately 90% of a disputed insurance claim arising from the COVID-19 pandemic.  The Court should deny the motion because Social Life has not met the exacting standards for preliminary injunctive relief.

*First*, Social Life cannot meet what the Second Circuit considers the "most important" element of a preliminary injunction application:  irreparable harm.  This is a breach of contract case seeking money damages, the paradigm fact pattern for *denying* a preliminary injunction.  Damages are not an "injunction" at all, or even equitable relief.  To nonetheless support a finding of irreparable harm, Social Life submits a declaration from its President stating that the insurance funds are necessary to publish its next issue on time.  He then leaps to a worst-case scenario conclusion:  if Social Life misses that issue, advertisers and customers will allegedly flee *en masse*, causing the business to close.  But courts routinely reject unsupported doomsday predictions like this one.  Social Life cites no case, and Sentinel is aware of none, in which a property insurer was forced to effectively "pre-pay" a disputed claim, or where a plaintiff seeking contract damages obtained a preliminary "injunction" of damages based on a claimed need to be paid the damages urgently.

*Second*, even if Social Life could show irreparable harm, it has not shown a clear likelihood of success on the merits (the heightened standard that applies where, as here, the injunction would alter the status quo).

Social Life has coverage only where there is "direct physical loss of" or "physical damage to" property at its premises that causes a suspension in operations.  New York law is clear that this requirement is not met where a business is forced to close for reasons *external* to

the premises and unrelated to property damage.  Here, Social Life's premises are closed not because of any property damage at the premises but because of an external factor:  governmental orders mandating that non-essential businesses close, to limit the spread of COVID-19.  Those orders have nothing to do with property damage, or property at all.  The point is to keep people away from one another, not away from damaged property or buildings.

Further, there is no evidence that Social Life's property has any "physical" loss or damage.  Even assuming that the virus causing COVID-19 (which remains viable for a few days at most) could create physical property damage, Social Life has put forth no evidence that the virus in fact damaged its premises, or even that the virus was ever there.

Social Life also invokes a provision covering business losses when "access to" its premises is "specifically prohibited by order of a civil authority as the direct result" of property losses "in the immediate area."  This language might apply if, for example, the building next to Social Life's premises collapsed, and city officials closed down the entire block.  But nothing like that happened.  Social Life's employees are not prohibited from freely accessing the premises, even though on-site operations are halted.  The civil restriction on which Social Life relies is intended to keep people away from one another, and was not issued because of any property damage in the "immediate area" of Social Life's facilities.

Simply put, there is no coverage for Social Life's claims.  While the COVID-19 pandemic has impacted businesses in unprecedented ways, it does not vitiate the terms of Sentinel's insurance contract to create coverage where none exists.

*Third*, the remaining factors (the balance of harms and the public interest) favor Sentinel.

Giving Social Life nearly all of its relief on the merits up front reverses the normal financial risk allocation of litigation, and would unfairly require Sentinel to chase Social Life to

collect a judgment, if Sentinel were to prevail at the conclusion of the case.  Further, Social Life is just one of many policyholders impacted by the COVID-19 pandemic and seeking insurance coverage for it.  To force Sentinel to pay all claims up front regardless of coverage and then try to recoup later — from businesses claiming financial instability — could significantly impact the insurance industry and economy as a whole.

Social Life concedes there is no public interest implicated by its proposed injunction, which favors denial of the motion.

For all of these reasons and others appearing on the record, the Court should deny Social Life's motion for a preliminary injunction.

## BACKGROUND FACTS

### Social Life

Social Life produces a monthly magazine that is distributed in retail stores in the Hamptons and that, according to its website, is "the premier luxury publication for the Hamptons."[1] (ECF 8-1 ¶ 4.)  Social Life's offices are in New York City.  (ECF 3 ¶ 8.)

On March 17, 2020, Social Life closed its offices because of COVID-19.  (ECF 8-1 ¶ 4.) The same day, Social Life made a business interruption insurance claim by telephone via its insurance broker.  (*Id*. ¶ 5.)

### Social Life's Insurance Coverage

Social Life purchased property insurance from Sentinel.  (ECF 8-10.)  For purposes of this motion, Social Life is invoking two aspects of its insurance coverage.  (ECF 8-19, at 6 (plaintiff's "application relates to only two of [the] claims . . .").)

---

[1] https://sociallifemagazine.com/about-us/

First, Sentinel agreed to "pay for direct physical loss of or physical damage to Covered Property at the premises," which includes, as "Additional Coverage," the "actual loss of Business Income [Social Life] sustain[s] due to the necessary suspension of [its] 'operations' during a 'period of restoration.'" (ECF 8-10, at Special Property Coverage Form, pgs. 1, 3, and 10 (pgs. 30, 32 and 39 of pdf).)  For these purposes, the "suspension must be caused by direct physical loss of or physical damage to property at the" premises.  (*Id*. at 10 (pg. 39 of pdf).)

Second, Sentinel agreed to cover "the actual loss of Business Income [Social Life] sustain[s] when access to [its] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area" of the premises.  (*Id*. at pg. 11 (pg. 40 of pdf).)  The phrase "Covered Cause of Loss" means "risks of direct physical loss," unless excluded or limited.  (*Id*. at pg. 3 (pg. 31 of pdf) (capitalization removed).)

**Sentinel Denies Coverage**

On March 26, 2020, Sentinel wrote a letter to Social Life denying coverage.  (ECF 8-6.) Sentinel explained that Social Life had "not identified any physical loss to any property" at its premises, nor any "information to indicate that a civil authority issued an order" pertaining to "property in the immediate area of" Social Life's premises.  (*Id*. at 2-3.)  Social Life also identified various policy exclusions that could potentially apply.  (*Id*. at 4-6.)  Sentinel is not raising those exclusions for purposes of this particular motion, but continues to reserve its rights with respect to any exclusions that might apply.

On April 17, 2020, Social Life's counsel, Gabriel Fischbarg, wrote back to Sentinel. (ECF 8-7.)  With respect to the issue of direct physical loss or physical damage, Mr. Fischbarg argued, without evidence, that "all of the insured's equipment at the scheduled premises" suffered a physical loss insofar as the equipment was "contaminated by the virus . . . and

- 4 -

rendered unusable." (*Id*. at 1-2.)   With respect to the "civil authority" issue, Mr. Fischbarg also

argued that there had been an Executive Order "banning the insured's use of the scheduled

premises and the equipment therein." (*Id*. at 2.)

On April 27, 2020, Sentinel responded, maintaining its position.  (ECF 8-9.)  Sentinel

explained that, even if the virus causing COVID-19 could inflict property damage, "there is no

evidence that Social Life's property has suffered direct physical loss or damage." (*Id*. at 1.)

Sentinel also stated that the closure order at issue "was not issued because of any direct physical

loss to property in the immediate area of the scheduled premises" — the causal relationship

required for coverage — but rather was issued "to prevent community spread of COVID-19."

(*Id*. at 2.)

## Procedural History

On April 29, 2020, Social Life filed the complaint in this case, asserting one claim for

breach of contract.  (ECF 3.)

On May 4, 2020, Social Life moved, by Order to Show cause, for a preliminary

injunction "compelling defendant to pay plaintiff $197,000" (ECF 8, at 1), which represents over

90% of Social Life's $216,000 insurance claim.  (ECF 8-1 ¶ 14.)

Social Life's application was supported by a Declaration from its President, Justin

Mitchell.  (*Id*.)  Mr. Mitchell states that he would plan to use the funds sought by this application

to either (1) have the Social Life premises professionally cleaned immediately after Executive

Orders limiting access to the premises expire on May 15, 2020; or, if the Executive Orders are

extended, (2) to arrange to produce the magazine elsewhere.  (*Id.* ¶ 8.)

According to Mr. Mitchell, if production can get underway in mid-May, Social Life's

magazine can be distributed by the weekend of May 29, 2020, as required by Social Life's

contracts with its advertisers.  (*Id*. ¶ 9.)  If Social Life cannot publish through the summer, Mr.

Mitchell claims it will have to pay back $163,300 in pre-paid advertising.  (*Id*. ¶ 15.)  Social Life does not have sufficient cash to pay back its advertisers because the money was spent on ordinary business expenses.  (*Id*.)  Mr. Mitchell claims that, if Social Life has to delay publication, it "will not survive the loss of good will with its advertising customers." (*Id*. ¶ 10.)

On May 8, 2020, Social Life filed an Amended Complaint that is substantially identical to the Original Complaint, except that it adds a claim for breach of the implied duty of good faith.  (ECF 11 ¶¶ 50-54.)

The same day, Social Life filed a Supplemental Declaration from Mr. Michell, in which he provided an updated amount of pre-paid advertising that would have to be refunded if the magazine cannot publish through the summer:  $202,140 instead of $163,300.  (ECF 12 ¶ 3.) The Supplemental Declaration attaches what are described as "the contracts/purchase orders for each of the advertisers" (*id*. ¶ 2), but none specifies that advertisers can demand refunds, or when the refunds would be paid.  (ECF 12-2.)  In fact, what appears to be Social Life's standard-one page order form states, "There are no refunds or cancellations."  (*Id*. at 17-20, 36, 56.)

## STANDARD FOR A PRELIMINARY INJUNCTION

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted emphasis removed).  To carry that burden, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008) (alterations added).

Social Life has not met any of these elements.

## DISCUSSION

### I.    SOCIAL LIFE HAS NOT SHOWN IRREPARABLE HARM

Showing irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation omitted).  This critical element is rarely met in cases like this one, where the plaintiff seeks money damages for an alleged breach of contract.  That is because the "classic remedy for breach of contract is an action at law for monetary damages," and "[i]f an injury can be appropriately compensated by an award of monetary damages," the injury is not irreparable. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).  Indeed, Social Life explicitly acknowledges that injunctions are appropriate only where "plaintiff is likely to suffer irreparable injury that cannot be remedied with monetary damages."  (ECF 8-19, at 5.)

Here, Social Life has calculated its claim down to the dollar — $215,587 (*see* ECF 8-1 ¶ 14) — and so its injury can be addressed in the ordinary course of litigation.  We are not aware of any case, and Social Life cites none, where a preliminary injunction forced a property insurer to pay all or part of a claim at the outset of a litigation.

Social Life nonetheless argues that it will suffer an irreparable loss of goodwill with its advertisers and customers if it cannot publish its next issue, and that the damage will cause it to go out of business.  (ECF 8-19, at 18-22.)  But the underlying evidence is the bare assertion from Social Life's President, Mr. Mitchell, that Social Life operates in "in an extremely competitive environment" and that its "relationship with its customers is extremely fragile." (ECF 8-1 ¶ 10.) According to Mr. Mitchell:  "Once [Social Life] loses a customer, that customer will not return given that it left due to a bad experience with [Social Life's] business." (*Id.* ¶ 12.)

Mr. Mitchell also states that, absent an injunction, Social Life will have to refund $202,140 in pre-paid advertising, but lacks the cash on hand to do so. (ECF 12 ¶ 3.)  Mr.

Mitchell does not explain whether Social Life has or could try to work out arrangements with advertisers to either defer the advertisements to later issues of the magazine, or to establish workable payment plans for the refunds.  In fact, Social Life's standard advertising contract provides for *no* refunds.  (ECF 12-2 at 17-20, 36, 56.)  Yet Mr. Mitchell leaps to the conclusion that, absent an immediate injunction, Social Life "will be out of business." (ECF 8-1 ¶ 13.)

The Court should approach Social Life's thinly-supported, dire predictions with a healthy dose of skepticism.  The COVID-19 pandemic is impacting everyone, and so it is difficult to understand why Social Life's customers or advertisers (none of whom are identified) would be so quick to terminate their relationship with Social Life.  This is particularly so because Social Life's magazine is distributed "in and in front of retail establishments" (*id*. ¶ 4) which will presumably still have minimal customer traffic next month, even if Social Life is able to publish its next issue on time.  Mr. Mitchell does not say why advertisers would want their ads to appear in magazines sitting within empty stores.

Social Life also makes no mention of the broad government assistance provided to businesses impacted by COVID-19.  *See generally* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136 (2020) (the "CARES Act").  For example, the CARES Act authorizes loans of up to $10 million to help small business pay operational costs like payroll and rent, and under certain circumstances the loans can be forgiven in full.  *See id.* §§ 1102 ("Paycheck Protection Program"), 1106 ("Loan Forgiveness").

Courts in this Circuit do not credit "speculative" assertions that a plaintiff will be "put out of business" without an immediate injunction.  *See Auto Sunroof of Larchmont, Inc. v. American Sunroof Corp.*, 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986).  Instead, "[w]here the claim is made that a firm will go out of business, a plaintiff must offer detailed information about its finances"

- 8 -

before there is a finding of irreparable harm.  *Paramount Brands, Inc. v. Peerless Importers, Inc.*, No. CV-92-5190, 1992 WL 355601, at *5 (E.D.N.Y. Nov. 19, 1992).  Equally insufficient are "conclusory statements of loss of reputation and goodwill." *Shepard Indus., Inc. v. 135 East 57th Street, LLC*, 97 Civ. 8447, 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999); *see also Passlogix, Inc. v. 2FA Tech., LLC*, 08 Civ. 10986, 2010 WL 2505628, at *10 (S.D.N.Y. June 21, 2010) (collecting cases).  These descriptions are apt in this case.  Because Social Life has offered only the barest of support for its claim of irreparable injury, the Court should find that it has not met the high burden associated with a preliminary injunction.

Social Life cites various cases in support of its position to the contrary, but those cases involve significantly different facts from those at issue here.  They fall into two broad groups.

The first group includes cases where former employees are threatening to lure away clients or customers using confidential or protected information — a situation that by its very nature involves a loss of goodwill that is difficult to quantify. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70-71 (2d Cir. 1999); *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (cited ECF 8-19, at 19).

The second group includes cases where defendants are enjoined from terminating a contractual relationship with a distributor or franchisee, and where the termination would effectively shut down the plaintiffs' business (or a business line).  *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (car dealer); *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 126 (2d Cir. 1984) (beverage distributor); *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 443 (2d Cir. 1977) (distributor of ceiling products); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (distributor of photographic equipment) (cited ECF 8-19, at 19-20.)  This situation

"inevitably creates irreparable damage to the good will" of the plaintiff. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990).

In both of these types of cases, the defendants' threatened termination or other conduct was the *direct* cause of the plaintiffs' alleged harm, and the injunction was aimed at merely preserving the status quo. But, here, Sentinel has nothing to do with Social Life's relationships with its customers or advertising, and is not threatening to do (or not do) anything to disrupt those relationships. Instead, the alleged harm is premised on the speculative assertion that, unless Social Life is awarded 90% of its claimed damages at the outset, it will face a liquidity crunch that will, in turn, impair Social Life's business. Social Life cites no precedent for an injunction awarded on facts remotely similar.

The court's decision *Interboro Institute, Inc. v. Maurer*, 956 F. Supp. 188, 194 (N.D.N.Y. 1997) is instructive on this point. A junior college, Interboro, sued the New York State Higher Education Services Corporation for having threatened to withhold certain $4.8 million in funds that Interboro was expecting. The court found no irreparable harm because "unlike *Roso–Lino* and *Semmes Motors*" — two of the cases Social Life cites here — "the plaintiff is not facing action that would effectively remove the *ability* of Interboro to function as a junior college." *Id.* at 194 (emphasis in original). While Interboro argued it was facing insolvency without the money, the court found that Interboro was portraying a "worst case scenario" that the court did not credit. *Id.* Here, like the defendant in *Interboro*, Sentinel is not accused of doing anything to threaten the *ability* of Social Life's business to function; rather, Social Life is speculating, under "worst case" assumptions, that its survival turns on pre-payment of its insurance claim. As in *Interboro*, this does not amount to irreparable harm.

- 10 -

II.    SOCIAL LIFE HAS NOT SHOWN A CLEAR OR SUBSTANTIAL
       LIKELIHOOD OF SUCCESS ON THE MERITS

Where, as here, a plaintiff seeks to "alter" or "disrupt" the status quo (referred to as a

"mandatory" injunction), it does not suffice to show a mere likelihood of success.  Rather, the

plaintiff "must meet a heightened legal standard by showing 'a clear or substantial likelihood of

success on the merits.'" *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d

32, 36-37 (2d Cir. 2018). (citation omitted).  "This heightened showing is also required where

the issuance of the injunction would provide the movant with substantially all the relief he or she

seeks" in the case. *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997).  Because Social

Life seeks by this application immediate payment of over 90% of its $216,000 insurance claim

(ECF 8-1 ¶ 14), the heightened standard is governing for this independent reason.

Social Life has not shown a clear likelihood of success on breach of contract claim, and

this is an independent basis to deny its motion.[2]

For these purposes, Social Life "bears the burden of showing that the insurance contract

covers the loss." *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d

Cir. 2000). In evaluating whether Social Life has met that burden, courts apply the familiar

standards to contracts generally.  That is, "an insurance contract is interpreted to give effect to

the intent of the parties as expressed in the clear language of the contract." *Village of Sylvan

Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir. 1995).

This "plain language" rule is essential to the functioning of the insurance industry.

Insurers are in the business of pricing risk, and that would not be possible if courts could

---

[2] Social Life's claim for breach of the implied duty of good faith was added after this application
was filed, and so should not be considered at all.  Even if considered, Social Life cannot prevail
so long as Sentinel has an "arguable" basis for its position. *Jane Street Holding, LLC v. Aspen
American Ins. Co.*, 13 Civ. 2291, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014).  Sentinel's
coverage denial easily meets that standard.

arbitrarily bind an insurer to "a risk that it did not contemplate and for which it has not been paid." *Dae Associates, LLC v. AXA Art Ins. Corp.*, 158 A.D.3d 493, 494 (1st Dep't 2018).  For the same reason, a court should "not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation." *Keyspan Gas East Corp. v Munich Reinsurance Am.*, *Inc.*, 96 N.E.3d 209, 216 (N.Y. 2019).

As detailed below, Social Life has not met its burden as to either of the threshold coverage questions.

### A. Social Life Has Not Shown Coverage Under the Clause for "Direct Physical Loss" or "Physical Damage"

The policy term covering certain direct physical loss or physical damage to property is inapplicable for multiple, independent reasons, discussed below.

### 1. Social Life's Closure Was Caused by the Pandemic, Not By Property Damage At Its Premises

For Social Life to prevail on its business income claim, the policy requires that the suspension of Social Life's operations must have been "caused by direct physical loss of or physical damage to property."  It was not.

Under New York law, a business forced to close because of external factors — as opposed to tangible damage on the premises — cannot recover under insurance policies for direct physical loss or physical damage to property.  Here, Social Life was closed because of Executive Orders from Governor Cuomo that were, in turn, motivated by the imperative to limit community spread during the COVID-19 pandemic.  None of this has anything to do with any physical property loss or physical damage at Social Life's premises.

In the leading New York case, *Roundabout Theatre Co. v Contin. Cas. Co.*, 302 A.D.2d 1, 3 (1st Dep't 2002), the scaffolding of a midtown building collapsed, causing New York City to order the closure of certain surrounding blocks.  As a result, a Broadway theater which was

not itself damaged "became inaccessible to the public and . . . was forced to cancel 35 performances of *Cabaret*." *Id*.

The trial court had interpreted the coverage language — "direct physical loss or damage to the property" — expansively to include "loss of use" of the property. *Id.* But the First Department reversed, finding that the trial court had "completely ignore[d]" the policy's plain language, which was "limited to losses involving physical damage to the insured's property." *Id*. As the First Department explained: "The plain meaning of the words 'direct' and 'physical' narrow the scope of coverage and mandates the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy." *Id*. at 7.

The rule in *Roundabout* was applied by Judge Engelmayer in another highly instructive case, *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co*., 17 F. Supp. 3d 323 (S.D.N.Y. 2014). (*Roundabout* was binding in *Newman Myers*, just as it is binding here, because there is no "persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion." *Pahuta v. Massey-Ferguson, Inc*., 170 F.3d 125, 134 (2d Cir. 1999).)

In *Newman Myers*, power was preemptively shut off to certain areas of New York City following Hurricane Sandy, and Judge Engelmayer concluded that language about direct physical loss or physical damage did not cover a law firm whose offices were inaccessible during the outage. After summarizing the *Roundabout* case, Judge Engelmayer explained: "The critical policy language here—'direct physical loss or damage'—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to trigger loss of business income and extra expense coverage." *Id*. at 331. He continued: "The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some

form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." *Id*.

The application of *Roundabout* and *Newman Myers* to the facts here is straightforward. Social Life has not shown that the virus actually contaminated its property, or that it was forced to close because of any particular damage to its property.  Instead, just like the theater in *Roundabout* and the law firm in *Newman Lewis*, Social Life's real grievance is that it lost the use of its premises as a result of an issue that was "exogenous to the premises themselves,"  17 F. Supp. 3d at 331— namely, the Executive Orders and the underlying imperative for people to stay distant from one another to control the spread of COVID-19.

Social Life's own Complaint in this case makes clear that the closure was based broadly on controlling the virus's spread, not property damage (or virus "damage") on the Social Life premises:  "**As a direct result of the infection caused by SARS-Cov-2 and the pandemic disease known as COVID-19**, plaintiff has lost access to, use of and/or functionality of plaintiff's property covered by the policy." (ECF 3 ¶ 19 (emphasis added).)  Consistent with that concession, in the press release announcing Executive Order closing nonessential businesses statewide, Governor Cuomo stated: "We know the most effective way to reduce the spread of this virus is through **social distancing** and **density reduction** measures."  (Michael Decl. Ex. A, at 3 (emphasis added).)  There is no reference to property damage in the press release or accompanying Executive Order. (ECF 8-4.)

Social Life admits that it was closed only because its "magazine business does not provide essential services" (ECF 8-19, at 7), and the distinction between essential and non-essential businesses is yet further confirmation that the Executive Orders at issue are aimed at limiting community spread to the greatest extent practical, and are not based on identifying

premises that have suffered a direct physical loss or physical damage.  Otherwise, the Executive

Orders would have distinguished damaged premises from undamaged ones.

Consider this hypothetical:  If property damage were the cause of the Social Life closure

(say, if the roof had collapsed), then Social Life likely would be closed whether it were essential

or not.  Or consider if Social Life's premises had been used to provide critical services (say,

publishing medical pamphlets instead of luxury magazines).  In that case, Social Life might be

considered an essential business and remained fully open.  (Ex. 8-5, at 2 (Executive Order

defining essential business to include "health care operations" and necessary vendors to essential

businesses ).)  These examples show the closure of Social Life offices was ultimately based on

the nature of its business as non-essential — meaning its workers could stay home — and was

not "caused by direct physical loss of or physical damage to property at the" premises.  (ECF

8-10, at Special Property Coverage Form, at 10 (pg. 39 of pdf).)

Finally, it bears mentioning that Sentinel's interpretation is a widely-understood one,

even in the specific context of COVID-19.  The website of the New York Department of

Financial Services (the regulator of insurance) states that "[b]usiness interruption coverage

typically can only be triggered if you have property loss that leads to the business interruption,"

such as "a fire in your office." (Michael Decl. Ex. B, at 1.)  The website adds that "Fear of

COVID-19 alone is unlikely to trigger business interruption insurance coverage." (*Id*. at 2.)

These statements make the decisive point — that without direct, physical property loss leading to

the business interruption, there is no coverage.  Social Life's motion should therefore be denied.

### 2.    Social Life Has Not Shown That There Was Any "Physical" Loss or Damage to Its Premises

Not only has Social Life failed to demonstrate the cause of its loss was direct physical

loss or physical damage, it also has not shown that any loss or damage, whether from the virus or

anything else, was "physical" in nature.  (ECF 8-10, at Special Property Coverage Form, at 10

(pg. 39 of pdf).)  Social Life has failed to meet its burden for this independent reason.

The term "physical" means "pertaining to real, tangible objects." Black's Law Dictionary

(11th ed. 2019).  In the insurance context, the "requirement that the loss be 'physical,'" is

"widely held" to "preclude any claim against the property insurer when the insured merely

suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical

alteration of the property." 10A Steven Plitt, et al. Couch on Insurance § 148:46 (3d ed. 1995);

*see also Iannucci v. Allstate Ins. Co.*, 354 F. Supp. 3d 125, 140 (N.D.N.Y. 2018) (same); *Phil.*

*Parking Auth. v. Federal Ins. Co.*, 385 F.Supp.2d 280, 288 (S.D.N.Y. 2005) (the "interruption in

business must be caused by some physical problem with the covered property," such as

"structural damage caused by a fire").

Thus, for example:

- In *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002), the Third Circuit concluded that the "mere presence of asbestos" in a building was not "physical loss or damage" because that did not amount to "'a distinct, demonstrable, and physical alteration' of its structure." *Id.* at 235-36 (citation omitted).  The court explained that a physical loss would require an "actual release of [asbestos] fibers" such that the "structure is made useless or uninhabitable. *Id.* at 236.

- In *Universal Image Productions, Inc. v. Federal Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012), the Sixth Circuit concluded that mold and bacteria in a building did not amount to "direct physical loss" because that phrase "contemplates an actual change in insured property" — that is, "tangible" damage.

- In *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1144 (Ohio App. 2008), the court found that "mold staining on the exterior siding of the house" did not "not rise to the level of 'physical injury'" because it "did not affect the structure of the wood" and could be remediated by cleaning.

- In *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), road construction created dust and debris that an adjacent restaurant had to constantly clean, but the court found this was not a covered because "cleaning is not considered direct physical loss."

These authorities correctly read the term "physical" in accordance with its plain meaning, which cannot be stretched to include "damage" from a virus that Social Life concedes can simply be cleaned away.  (ECF 8-1 ¶ 8.)  And even if the virus were never cleaned, it can remain viable at most a few hours or days on surfaces. *See* Dr. Neeltje van Doremalen, et al., Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, *New England Journal of Medicine* (Apr. 16, 2020) (copy attached as Michael Decl. Ex. C).  This ephemeral presence cannot by any stretch amount to loss or damage that is "physical."

Further confirmation of this reading is the fact that the coverage Social Life seeks would extend through a "period of restoration," which ends when the property at premises "should be *repaired, rebuilt or replaced* with reasonable speed and similar quality."  (ECF 8-10, at Special Property Coverage Form, pg. 24 (pg. 53 of pdf) (emphasis added).)  This clause indicates that coverage extends only to property that has suffered the type of physical damage that would need repairing, rebuilding or replacing.  *See Newman Myers*, 17 F. Supp. 3d at 332 ("The words 'repair' and 'replace' contemplate physical damage to the insured premises . . . .").  Social Life concededly plans to only "clean" the premises (ECF 8-1 ¶ 8), and it would torture the English language to say that cleaning property is the same as "repairing" or "rebuilding" it.

Social Life argues in its brief that its "physical loss or damage has been acknowledged and codified by New York State's Executive Orders" (ECF 8-19, at 8), but the cited orders do not refer to any property damage.  (ECF 8-3, 8-4, 8-5.)  In any case, no executive order can change the reality about what property damage did or did not occur at Social Life's offices.  Simply put, Social Life has put forth zero evidence of physical loss or physical damage to property, and has therefore not met its burden of proof.

### 3.     The Absence of a Virus Exclusion Does
### Not Mean Virus Related Losses Are Covered

Social Life points out that the policy lacks any exclusion explicitly referencing viruses (ECF 8-19, at 11-12), as well as an exclusion that references specific "infestations" other than viruses (*id*. at 8-9), and argues that both are evidence that losses from a virus were intended to be covered.  Not true.  The law is clear that the policyholder bears the initial burden of demonstrating the alleged loss falls within the policy.  *Morgan Stanley*, 225 F.3d 270 at 276.  The presence or absence of an exclusion addressing a specific condition, such as a virus, does not shed any light on whether there has been direct physical loss or physical damage in the first instance.  If Social Life's inferential argument were correct, then any peril would be covered regardless of whether it caused physical loss or physical damage (such as an outbreak of the common cold among the staff).

The "infestation" exclusion Social Life cites is equally unhelpful.  The exclusion states that Sentinel does not cover "physical loss or physical damage caused by . . . [n]esting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, mold, spore or other animals."  (ECF 8-10, at Special Property Coverage Form, pg. 17 (pg. 46 of pdf).)  Social Life argues that this language is somehow inconsistent with Sentinel's position that "coronavirus is not 'physical' in nature."  (ECF 8-19, at 8.)  This is incorrect.  The exclusion simply lists specific excluded matters.  More important, the issue is not whether the "coronavirus is physical"; the issue is whether it caused physical loss or physical damage to Social Life's property.  It did not.  The coronavirus resulted in governmental orders intended to limit interpersonal contact, which were and remain wholly unrelated to the physical condition of Social Life's property.

Regardless of whether the virus causing COVID-19 could theoretically physically damage property (and Social Life has provided nothing to suggest as much), the central flaw in Social Life's motion that it has put forward *no* evidence of physical loss or physical damage to its property *at all*, whether caused by a virus or anything else.

### 4. Social Life Relies on Easily Distinguishable Cases That Are Primarily From Outside New York

In arguing that its loss is covered, Social Life relies almost exclusively on out-of-state cases that are distinguishable.

The majority of the cases it cites involved the confirmed presence of toxins or other substances that rendered property totally unusable, including where:

- the policyholder's "home ha[d] been rendered uninhabitable by the toxic gases released by" the drywall, *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) (cited ECF 8-19, at 12);

- the policyholder's home was "made useless or uninhabitable" because of *E. coli* bacteria that had made the entire household ill, *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x. 823, 827 (3d Cir. 2005) (cited ECF 8-19, at 13);

- the release of ammonia that rendered a packaging facility "physically unfit for normal human occupancy," *Gregory Packaging, Inc. v. Travelers Property Cas. Co.*, No. 2:12-cv-04418, 2014 WL 6675934, at *3-4 (D.N.J. Nov. 25, 2014) (cited ECF 8-19, at 14).

These cases are all from outside New York and are inconsistent with the plain meaning of the key policy language about "direct physical loss of or physical damage to property," discussed above. Regardless, they are easily distinguishable. As Judge Engelmayer explained: "Whether or not these cases were each correctly decided, each involved the closure of a building due to . . . a physical change for the worse in the premises." *Newman Myers Kreines*, 17 F. Supp. 3d 323 (distinguishing *TRAVCO* and *Motorists*). This is quite a different scenario from "forced closure of the premises for reasons exogenous to the premises themselves." *Id*.

Social Life has not offered any evidence that its premises are uninhabitable because of any change to the premises.  As discussed, there is no evidence that the virus causing COVID-19 ever was on the premises, nor any evidence the closure was related to any physical loss, physical damage, or other condition on the premises.

In addition, Social Life's premises are not uninhabitable, as were the premises in the cases it cites.  Under the Executive Orders at issue, personnel of non-essential businesses are permitted to visit the premises "temporarily" to "pick up the mail or perform a similar routine function," so long as "they will not be in contact with other people."  (Michael Decl. Ex. D, at 3 (Question 13) (Frequently Asked Questions from Empire State Development Corporation).) This makes clear that the underlying concern is person-to-person contact, and is inconsistent with any suggestion that the premises themselves have a condition rendering them unsafe.

### 5. The Two New York Cases Social Life Cites Support Sentinel's Position

Social Life relies only on two New York cases, and both are unhelpful to its position.

In *Downtown Restaurant v. Fireman's Ins.*, No. 0602848/2003, 2007 WL 2175637 (N.Y. Sup. Ct. May 17, 2007) (cited ECF 8-19, at 14), a restaurant near the World Trade Center was closed after the September 11, 2001 attacks.  The court denied the insurance company summary judgment because of testimony that the restaurant suffered "physical damage," requiring "cleaning, debris removal, and mechanical repairs."  *Id*.  Here there is no such evidence.

In *Datatab, Inc. v. St. Paul Fire & Marine Ins. Co*., 347 F. Supp. 36, 37 (S.D.N.Y. 1972), flooding in a building's basement forced a shutdown of a business that was located on higher floors and that was not itself physically damaged.  The court found that business interruption policy at issue could supply coverage, but focused on language in an "extension clause" — which the policy here lacks — providing coverage when the "premises in which the property is

located is so damaged as to prevent access to such property." *Id*. at 37-38.  There is no similar

extension clause here, and this Court should not rewrite the policy as if it included one.

      **B.**     <u>**Social Life Has Not Shown Coverage Under the "Civil Authority" Clause**</u>

      Social Life's memorandum of law states at the beginning that the "civil authority" clause

is one of the two grounds for its motion, but then it never actually addresses the clause.  (ECF

8-19, at 5.)  The policy language is never quoted or discussed, and no cases are cited.

      As this Court has recognized, arguments that  "are advanced 'in a perfunctory manner,

unaccompanied by some effort at developed argumentation,' may be deemed waived." *Diggs v.*

*City of New York*, 11 Civ. 1127, 2019 WL 4361023, at *4 (S.D.N.Y. Sept. 12, 2019) (citations

omitted) (Caproni, J.)  After all, courts should not be in the business of "construct[ing]

arguments that [parties] have not raised themselves." *Id*.  On this basis alone, the Court should

refuse to issue an injunction based on the "civil authority" issue.

      In any event, Social Life could not possibly show a clear likelihood of success.  Sentinel

agreed to cover only "the actual loss of Business Income [Social Life] sustain[s] when access to

[its] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct

result of a Covered Cause of Loss to property in the immediate area" of the premises. (ECF 8-10,

at Special Property Coverage Form pg. 11 (pg. 40 of pdf).)  The phrase "Covered Cause of Loss"

refers to "risks of direct physical loss." (*Id*. at pg. 2 (pg. 31 of pdf) (capitalization removed).)

Accordingly, for Social Life to recover, it would have to show that it lost income because

(1) "access" to its premises was "specifically prohibited by order of a civil authority," and

(2) that the order from a civil authority was "the direct result" of (a) "risks of direct physical

loss" (b) "to property in the immediate area."  Social Life has not met these elements.

      First, Social Life has not shown "direct physical loss" for all the reason discussed above,

either at its own premises or in the immediate area.

Second, access to its premises is not "specifically prohibited."  As discussed, employees may visit the premises so long as they stay away from others.  (Michael Decl. Ex. D, at 3 (Question 13).)  Cases across the country recognize that this language is not triggered where a policyholder's premises is only rendered less accessible but not fully "prohibited."  *See, e.g.*, *S. Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1139-41 (10th Cir. 2004) (grounding of flights after September 11th made it more difficult for customers to access plaintiff's hotels but did not "prohibit access"); *St. Paul Mercury Ins. Co. v. Magnolia Lady, Inc.*, No. 2:97-cv-153 BB, 1999 WL 33537191, at *3 (N.D. Miss. Nov. 4, 1999) (civil authority coverage not triggered by bridge closure that reduced casino-hotel's business by 80% but did not completely cut off access); *Syufy Enters. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995) (curfews imposed during period of civil unrest did not specifically prohibit access to the policyholders' movie theaters).

Third, even if access were considered "prohibited," that was not the "direct result" of damage to "property in the immediate area."  There is no evidence here about damaged property (or even evidence of virus contamination) in or around Social Life.  The access restrictions, as discussed, are about keeping people distant from one another.  If the driving concern were about damaged or contaminated property, then the government would have ordered businesses to repair or decontaminate their premises instead of ordering people to stay home.

The Second Circuit's decision in *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128 (2d Cir. 2006) is instructive. There, United Air Lines sought recovery for losses caused by the temporary shutdown of Reagan Washington National Airport following the September 11, 2001 terrorist attacks.  United invoked a substantially similar clause, providing coverage "when access to the Insured Locations is prohibited by order of civil authority as a direct result of

damage to adjacent premises." *Id*. at 129.  According to United, the shutdown was due to damage at the Pentagon nearby.  The Second Circuit found there was no coverage because, even assuming the Pentagon could be considered "adjacent premises," the government's "decision to halt operations at the Airport indefinitely was based on fears of future attacks," not about the fact that the Pentagon was damaged.  *Id*. at 134.

Just as in *United,* the "order of a civil authority" at issue here has everything to do with protecting human life by controlling when and how people assemble in particular places, and nothing to do with any damaged property.  No damaged property is referenced in the Executive Orders, and Social Life does not identify any particular property that is or was damaged.  The Court should follow *United* and conclude that Social Life has not shown a clear likelihood of success. *See also*, *e.g*., *Paradies Shops, Inc. v. Hartford Fire Ins. Co*., No. 1:03-cv-3154-JEC, 2004 WL 5704715, at *1-2, *6 (N.D. Ga. Dec. 15, 2004) (holding that there was no coverage in part because the FAA's order that grounded planes after September 11th was not a "direct result" of property damage); *S. Tex. Med. Clinics, P.A. v. CNA Fin. Corp*., No. H-06-4041, 2008 WL 450012, at *10 (S.D. Tex. Feb. 15, 2008) (evacuation of county before hurricane making landfall was "due to" fear of future damage rather than existing damage).

### III.   SOCIAL LIFE HAS NOT SHOWN THAT THE BALANCE OF HARMS OR PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION

Social Life gives only to the most cursory treatment to the final two elements, the balance of harms and public interest (ECF 8-19, at 23 (four sentences covering one-half of a page)), and has not met its burden as to either.

For the balance of harms, Social Life relies on the unsupported assertion that its "entire business is at risk" (*id*.), and ignores the harm in the other direction if an injunction issues.  If Sentinel is forced to pay the claim up front, then it will bear the full financial risk of the case, and

have to pursue judgment collection against Social Life if Sentinel prevails.  Under these circumstances — where the proposed injunction would "effectively provide [the plaintiff] all the relief sought in the complaint" — "the balance of hardships favors defendants." *Knapp v. Walden*, 367 F. Supp. 385, 388 (S.D.N.Y. 1973).

The D.C. Circuit's *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) illustrates the point.  There, a landlord in financial trouble sought an injunction allowing it to seize certain funds from a group of tenants that were allegedly in arrears on their rent.  The D.C. Circuit found that the balance of harms favored the tenants because, given the financial trouble of the landlord, "should [the tenants] ultimately prevail on the merits they would be unlikely to get their money back." *Id*. at 1173.  The court added that it was not "consistent with equitable principles to allow the financial hardship of one party to justify so greatly shifting the risk to the other." *Id*.

The same is true here, and even more so because Social Life is just one of many policyholders seeking coverage from Sentinel for business interruption losses arising from COVID-19.  Were Sentinel forced to pay every policyholder up front and litigate coverage later, it could have devastating effects on Sentinel and the insurance industry as a whole.  As the National Association of Insurance Commissioners observed: "if insurance companies are required to cover such [COVID-19] claims, such an action would create substantial solvency risks for the sector, significantly undermine the ability of insurers to pay other types of claims, and potentially exacerbate the negative financial and economic impacts the country is currently experiencing."  (Michael Decl. Ex. E).)

Finally, Social Life concedes the "public interest is not implicated" in this case (ECF 8-19, at 23), which necessarily means that its burden on this element is not met — and which weighs *against* an injunction.  11A Charles Alan Wright, et al., Federal Practice & Procedure

§ 2948.4 (3d ed. 2013) ("If the court finds there is no public interest supporting preliminary relief, that conclusion also supports denial of any injunction, even if the public interest would not be harmed by one.").  And there is of course no public interest in having an insurer pay for claims that lack merit, or bear the risk of losses that it has not agreed to bear.

IV.   **THE COURT SHOULD CONDITION ANY INJUNCTION ON SOCIAL LIFE POSTING ADEQUATE SECURITY**

If the Court is nonetheless inclined to issue an injunction, the Court should condition the injunction on Social Life posting adequate security.  Under Rule 65, the "court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added).

The court may not dispense with the security requirement unless "there has been no proof of likelihood of harm, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter involved.'" *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (citation omitted).  Neither of those exceptions applies here.  There is a likelihood of harm to Sentinel because, absent security, Sentinel would face the real risk of being unable to recover any pre-payment of the disputed claim.  This injunction sought has nothing to with preserving the court's jurisdiction, and so the second exception does not apply, either.

Any injunction should therefore be conditioned on Social Life posting adequate security.

## CONCLUSION

For the foregoing reasons and others appearing on the record, the Court should deny in its entirety Social Life's motion for a preliminary injunction.

Dated:  New York, New York
         May 12, 2020

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:   _/s/ Charles Michael_
         Charles Michael
         1114 Avenue of the Americas
         New York, New York 10036
         (212) 506-3900
         cmichael@steptoe.com

         Sarah D. Gordon*
         1330 Connecticut Avenue, NW
         Washington, D.C. 20036
         (202) 429-3000
         sgordon@steptoe.com
         *_pro hac vice_ application forthcoming

_Counsel for Sentinel Insurance Company Ltd._